PEARSON v. HARRIS.

(Circuit Court of Appeals, Ninth Circuit.   October 7, 1912.)

No. 2,077.

1. LIENS (§ 16*)—EQUITABLE LIEN—INVALIDITY OF MORTGAGE.

Complainant, who was general representative of an English mining corporation in charge of its property and operations in British Columbia and the United States, made advances to the company; the money being used for the development of its property generally, and for which he had an equitable lien thereon.   He also advanced the money for the purchase of certain mining claims for the company, taking the title to himself as security.   In a settlement with the company the amount of his claim was liquidated, an extension of time for payment granted, and it was agreed that in case of default the mining claims so purchased should be his property.   There was default, and pending litigation a new settlement was made with an agent holding a power of attorney from the company, who in its behalf executed notes to complainant, secured by a mortgage on its property; and complainant in reliance thereon, as agreed, procured patents for such mining claims and conveyed them to the company. *Held* that, on a finding that the notes and mortgage were invalid for want of power in the agent to bind the company, equity would re-establish complainant's prior equitable lien.

[Ed. Note.—For other cases, see Liens, Cent. Dig. §§ 7–16; Dec. Dig. § 16.*]

2. CORPORATIONS (§ 682*)—PRIORITIES BETWEEN LIENS—ENGLISH COMPANIES.

An equitable lien, acquired on mining property in the United States owned by an English corporation, for the operation and development of the property, cannot be displaced by debentures issued by the company in England, as authorized by the Companies Act of 1862 (St. 25 & 26 Vict. c. 89), which by the English law create a floating charge only, not restricting or interfering with the power of the company to prosecute the business for which it was organized in a foreign country, and to incumber its property there situated in the ordinary course of business, while it is a going concern, to one having no notice of the debentures.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2662; Dec. Dig. § 682.*]

Appeal from the Circuit Court of the United States for the District of Oregon.

Suit in equity by William J. Harris against the English-Canadian Company, Limited; William E. Pearson, intervener.   Decree for complainant, and intervener appeals.   Affirmed.

The appellee, Harris, was employed by the English-Canadian Company, Limited, an English corporation, in connection with its mining operations in Canada and British Columbia, and in the states of Oregon, Washington, and California, of the United States.   From December 1, 1898, to June 13, 1900, he held the general power of attorney of the company and had charge of its operations.   In the course of those operations he advanced for the company considerable sums of money when the company was out of funds.   He had been a foreman in mines and also a mining superintendent, and had acquired some money and also some stock in a corporation called the Lilly May Gold Mining Company, which owned a mine or mining claim called the Lilly May, in British Columbia.   Shortly before that time the English-Canadian Company, Limited, was organized, with Mr. A. Hay Anderson as the chairman of its board of directors, and with Mr. Walter Morshead and the present appellant, Mr. Pearson, as its principal men.   Two mining men by the name of White—Harry White and William R. White, who were brothers—were also

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

interested therein, one of whom purchased, through Harris, the Lilly May claim for the English-Canadian Company, Limited. Subsequently the company acquired a mining prospect called the Three W's Mine. The power of attorney from the English-Canadian Company, Limited, to Harris, was executed pursuant to a resolution of its board of directors adopted December 1, 1898, and by direction of the company he commenced the development of the Lilly May and Three W's mining claims. He also, under like employment and authority, investigated the nickel cobalt mining property of the English-Canadian Company, Limited, situated near Ottawa, and other mining prospects, without practical results from any of them. Finally Harris acquired for the company a placer mining property situated in Josephine county, in the state of Oregon, called the Waldo mining grounds, which, with the consent of the company, he took in his own name, and subsequently located, also for the company, but in his own name, a considerable portion of adjoining ground. All of this Oregon property was placer ground, and was worked by means of a dredge called the Josephine dredge. The original Waldo mining ground was owned by a Chinaman, from whom the company, through Harris, bought it about the month of June, 1899, for $14,500; the purchase money, together with some incidental expenses (the whole aggregating $16,-000), being advanced by Harris for the company. For this sum, and other advances that he had theretofore made for the company in its operations, Harris drew drafts on the company, which were not paid. Subsequently, however, the company did pay the $14,500, with which payment it was credited in the accounts kept by Harris, and which he from time to time reported to the company, showing it indebted to him in very considerable sums, and largely for advances of money made by him for the company.

Among the numerous proceedings of the company the record shows that "at an informal meeting of Messrs. Anderson, Morshead, and Pearson, held at 5, The Sanctuary, Westminster [its office], on Saturday, the 28th day of October, 1899, the secretary read a cablegram received from Mr. Harris this morning, as follows: 'I have not sufficient funds in hand to enable me to carry on work. Shall I close down? The general condition is simply ruinous for want of funds. Harris.' A long discussion on the position of the company then followed. Mr. Anderson offered to cable to Harris that he would send him 30,000 shares to enable him to raise the capital necessary to pay off the bank and continue to work the Chinaman's claim and the Three W's mine, and if he succeeded in raising the necessary capital he would make him a present of 10,000 shares as a bonus for so doing. After a long discussion Mr. Morshead and Mr. Peterson [Pearson] did not object to Mr. Anderson's making the offer to Mr. Harris, and the following cablegram sent by Mr. Anderson to Mr. Harris: 'Will give 30,000 shares to provide capital for carrying on. Work only Chinaman and Alberni. If you succeed in arrangement, will give you further 10,000 as bonus. Anderson.' It was proposed that Mr. Anderson and Mr. Morshead should proceed at once to the mines and investigate the company's affairs there."

That Harris was insistent that the company pay him the amount he claimed as advances to it, as well as for funds with which to continue the mining operations of the company, is shown, not only by his testimony and the numerous letters and cablegrams introduced in connection with it, but is also indicated by further proceedings of the board of directors of the company; for among the proceedings of the meeting held at the office of the company November 2, 1899, is the following: "A discussion of the financial affairs of the company then took place, and after consideration it was resolved, that the board are most anxious of seeing their way to assist the company's undertakings, and to arrange for the further necessary funds, but as the board has no particulars as to what engagements have been or are proposed to be made in the company's interest by Mr. Harris, it appears to the board that the right thing to do is for that gentleman to meet the board in London, or, failing his ability to come to London, to meet a member of the board in Montreal—this member would be Mr. Morshead. Upon matters being satisfactorily cleared up, the directors would arrange to immediately provide the necessary funds in London for carrying on the company's business. The question as to Mr. Morshead having full powers from the board

was discussed, and it was resolved that Mr. Burchell (solicitor) be requested to prepare a full power of attorney to act for the company in Canada and the United States."

And two days later, to wit, November 4, 1899, at a meeting of the board held at the company's office, at which were "present Mr. A. Hay Anderson, in the chair; Mr. Morshead and Mr. Pearson; in attendance, Mr. Burchell and the secretary"—the following proceedings were had: "The question as to the course the directors were to adopt in the present crisis was discussed. Mr. Burchell advised that Mr. Harris should be temporized with, and should be again asked to meet Mr. Morshead in Montreal; at the same time, if the creditors wished, application should be made to the court for the appointment of a receiver, and he, on behalf of the company, would assent thereto, and he advised that Messrs. Anderson, Morshead, and Pearson should be appointed receivers to the company. The meeting was then adjourned until 1:30 at the Colonial Club, when Mr. Mortimore was also present, and after some discussion the following resolutions were passed: It was proposed by Mr. Pearson, seconded by Mr. Anderson, and resolved, that all documents of title and other securities belonging to the English-Canadian Company, Limited, now in the custody and possession of Messrs. Burchell & Co., solicitors to the company, be held by them for and on behalf of the debenture holders by way of equitable mortgage, in the terms of the resolution of the board dated the 14th day of July, 1899. It was proposed by Mr. Anderson, seconded by Mr. Mortimore, and resolved, that under existing circumstances the board assents to an application intended to be made forthwith by Messrs. Anderson, Morshead, and Pearson, as equitable mortgagees, to apply to the court for the appointment of a receiver, being of opinion that this is the proper course to be adopted in the interests of the shareholders."

The resolution of the board of directors of July 14, 1899, referred to in the resolution last quoted, was adopted at a meeting of the board at the office of the company on July 14, 1899, at which were present, according to the minutes, "Mr. A. Hay Anderson, in the chair; Messrs. W. Morshead, A. Mortimore, and W. Pearson; in attendance, Mr. Burchell and the secretary"— and among the proceedings of that meeting were the following: "Mr. Morshead explained to the board that since the last meeting charges on the company's assets have been arranged by the directors as follows: £5,500 advanced by himself, £750 by Mr. Anderson, and £750 by Mr. Pearson. He also reported that further sums amounting to £2,940 would probably be required to meet expenses, and it was resolved, that the money already advanced be secured on an equitable charge, the trustees to be Mr. Anderson and Mr. Morshead, and that a further sum of £5,000, making, with the amounts aforesaid, the sum of £15,000, be borrowed and secured on the assets of the company in like manner, and that deeds be drawn up, sealed by the company, and handed to Mr. Morshead, Mr. Anderson, and Mr. Pearson."

In the proceedings of a meeting of the company held at its office November 6, 1899, at which were "present Messrs. Anderson, Morshead, and Mortimore; in attendance, Mr. Burchell and the secretary"—is the following: "A discussion took place as to the expediency of a director proceeding to Canada, and, Mr. Burchell having strongly expressed his views on the subject, it was resolved, that Mr. Pearson should be cabled to in Paris to ascertain if he would start for Canada on Wednesday."

The next day, to wit, November 7, 1899, these proceedings occurred at a meeting of the board held at the office of the company, at which were "present Messrs. Anderson, Morshead, and Mortimore; in attendance, Mr. Burchell and the secretary. The board having asked the advice of Mr. Burchell as to the course to be adopted under the present circumstances, and he having advised that it was essential that some director should proceed to Canada by the boat leaving Liverpool to-morrow, and Mr. Anderson having again repeated his offer to start at once, a long discussion arose, and the board adjourned until the afternoon. On the board reassembling, Mr. Morshead stated that he had taken other advice, and that he and Mr. Mortimore had decided that no director should start for Canada by the next boat. Mr. Burchell then stated that, as other persons' advice was being taken as to the position of the company, he felt that he could no longer usefully advise the

board, and tendered his resignation; but at their request he consented that the acceptance of it should be deferred until they had an opportunity of discussing it to-morrow morning."

The minutes of the company also show the following:

"At a meeting of the committee of the board held at the Colonial Club, No. 4, Whitehall Court, on Friday, the 10th day of November, 1899. Present: Mr. Morshead, in the chair. Mr. Pearson. In attendance, the secretary. The minutes of the meetings held on the 7th and 9th days of November were read, when Mr. Morshead reported that the minutes of the meeting held on the 7th day of November were incorrect in stating that it was resolved that no director should go to Canada, the fact being that during the adjournment he and Mr. Mortimore had further considered the matter, and had resolved not to send out Mr. Anderson, as had been proposed by him and advised by Mr. Burchell, to represent the board, at the cost of the company. The secretary read the following letter from Mr. Anderson, resigning his position as chairman and director o the board, as follows:

"'English-Canadian Company, Limited, 9th Nov., '99.

"'Dear Sir: As I am altogether unable to concur in the policy now adopted by the board, which is, in my opinion, not conceived in the interests of the shareholders, but in their own individual interests, I am unable to accept any responsibility for their actions, and what I must consider the suicidal policy now about to be adopted, and I hereby tender my resignation of the chairmanship and of the board. [Signed] Adam Hay Anderson.'

"Mr. Morshead was elected chairman pro tem. * * * The committee were of opinion that Mr. Pearson should start for Canada as soon as possible, and the secretary was instructed to let him have a list of documents of title in the company's possession, and a list of documents of title which are missing. It was also resolved that the deeds themselves should be handed to Messrs. Hoare's Bank as security for the money which had been advanced. A discussion as to the title deeds belonging to the company in the possession of Messrs. Burchell & Co. took place, and it was resolved, that they be handed to Messrs. Hoare & Co., the bankers, as security for the creditors entitled to the debentures, under the terms of the resolution of the 14th July, 1899."

At a meeting of the board held at the office of the company on the 14th of November, 1899, at which were "present Messrs. Morshead, Pearson, and Mortimore; in attendance, Mr. Burchell and the secretary"—the following proceedings appear to have been had: "Mr. Morshead was elected chairman of the company pro tem. Mr. Morshead informed the board that he had brought debenture bonds to secure the £3,500 and £2,000 advanced by him, and also for the £750 advanced by Mr. Anderson and the £750 advanced by Mr. Pearson, and it was resolved, that debenture bonds be sealed securing these amounts to the creditors. * * * Mr. Pearson informed the board that Messrs. Morshead, Mortimore, and himself would form a syndicate to find the funds for some one going out to Canada, in the event of Mr. Harris refusing to come over here to confer with the board, and that he [Mr. Pearson] would be prepared to start next Saturday."

At a meeting of the board held at the office of the company on the 17th of November, 1899, at which were "present Mr. W. Morshead, in the chair; Messrs. A. Mortimore and W. Pearson; in attendance, Mr. Burchell and the secretary—it was resolved, to grant Mr. Pearson full power of attorney, which Mr. Burchell promised would be ready by Monday next." And Mr. Pearson informed the board he would be prepared to leave for Canada on the following Wednesday. And at a meeting of the board held at the company's office on November 20, 1899, with the same parties present, the minutes show that "the power of attorney to Mr. Pearson was read and approved, and ordered to be sealed."

With the power of attorney from the company Pearson came to Canada. Harris met him at Ottawa. He had been operating for the company four mining properties, namely, the Lilly May, Three W's, Oregon Dredge Ground, and a property called the Fourteen Gold Mines. In their operation a general bank account was kept in the name of the company, on which Harris drew checks to meet the expenses, and to keep the company's account from becom-

ing exhausted he advanced for it from time to time the funds necessary for that purpose, making detailed monthly reports and statements thereof to the company. And Harris' testimony (which is somewhat corroborated by the written agreement next hereinafter set out) is to the effect that it was un-derstood that the Oregon Placer Ground, title to which stood in his name,. should be held by him as security for such advances.

At Ottawa, in the latter part of 1899, Harris, with his books, accounts, and records of the company's transactions, went with the company's attorney, Mr. Beament, and Pearson, its attorney in fact, before a chartered account-ant, a Mr. Black, representing the English-Canadian Company, Limited, and, after a lengthy investigation and examination by those parties, the account ant reported on the 6th day of January, 1900, to Pearson and Beament, the amount due from the company to Harris to be $33,409.44, subject to the pro-duction by Harris of certain enumerated vouchers, aggregating $1,750.23, which vouchers Harris subsequently produced, and following that report the company, by its attorney in fact, Pearson, and Harris, together with Ander-son and William R. White, entered into the following written agreement:

### "Ottawa Agreement.

"This agreement, made in quadruplicate this eleventh day of January in the year of our Lord one thousand nine hundred, between William Robert White, of the city of Seattle, in the state of Washington, one of the United States of America, broker, represented herein by his attorney, George W. H. White, of the said city of Seattle, broker, of the first part, Adam Hay Ander-son, of St. Ermins Mansions, London, England, gentleman, of the second part, William J. Harris, of the city of Spokane, in the state of Washington afore-said, mine owner, of the third part, and the English-Canadian Company (Limited), whose head office in England is in London, represented herein by Attorney William Pearson, of No. 29 Rue de Vinaigriers, Paris, France, here-inafter called the Company, of the fourth part.

"Whereas, the parties of the fourth part have, by powers of attorney duly executed and bearing date, respectively, the twentieth and twenty-fifth days of November, 1899, authorized and employed their said attorney, William Pearson, to investigate and regulate the affairs, property, and assets of the Company in the Dominion of Canada and the United States of America, with full power to make, sign, and enter into all contracts and agreements as may in his opinion be necessary for regulating or dealing with the property and assets of the said Company, as will by reference to the said powers of attor-ney more fully appear;

"And whereas, pursuant to said powers and authority the said William Pearson, with the assistance and co-operation of the other parties hereto, has investigated the said Company's affairs, and after such investigation it has been mutually agreed by the parties hereto to enter into this agree-ment, the same being considered as in the best interest of all the [B.] shareholders of the said Company, as the same will enable the oper-ation of the properties of the said company to be continued:

"Now, therefore, this agreement witnesseth that the parties hereto of the first, second, and third parts, in consideration of the premises and of the sum of one dollar of lawful money of Canada to each of the said parties of the first, second, and third parts in hand paid by the said Company (the receipt whereof is hereby acknowledged), do hereby covenant and agree as follows:

"1. The party of the first part hereby agrees to return forthwith to the said Company, for cancellation, certificates for sixty-five thousand shares of the capital stock of the said Company, or the pooled orders therefor, and hereby authorizes and empowers the proper officers of the said Company to make all necessary entries in the books of the said Company to effect a cancellation of such shares, and hereby appoints William Morshead, of the city of Lon-don, England, a director of the said Company, or the secretary of the said Company, his attorney, with full power to execute such documents as may be necessary to effect such cancellation and surrender, the said surrender and cancellation to be for the benefit of the said Company and to form an asset thereof, and the said William Robert White hereby acknowledges that he has received from the said Company all consideration to which he is entitled for

the various properties which he has conveyed or agreed to convey to the said Company, and he hereby releases and discharges the said Company from any and all claims and demands whatsoever from the beginning of the world to the day of the date hereof.

"2. The party of the second part hereby agrees to return forthwith to the said Company, for cancellation, certificates for fifty thousand shares of the capital stock of the said Company, or the pooled orders therefor, and hereby authorizes and empowers the proper officers of the said Company to make all necessary entries in the books of the said Company to effect a cancellation of such shares, and hereby appoints William Morshead, of the city of London, England, a director of the said Company, or the secretary thereof, his attorney, with full power to execute such documents as may be necessary to effect such cancellation and surrender, such shares to be dealt with as hereinbefore provided in paragraph number 1, and he, the said Adam Hay Anderson, hereby releases and discharges the said Company and the directors thereof from any and all claims and demands for compensation, damages, or otherwise howsoever from the beginning of the world to the day of the date hereof.

"3. And the said party of the third part hereby agrees to extend the time for payment of his claim against the said Company, and any interest that may be due him at the rate of ten per centum per annum for a period of six months from the date hereof, and in consideration of such extension of time for payment, and in order to secure the said indebtedness, the said Company hereby grants unto the said William J. Harris the right to operate and use the dredge 'Josephine,' situate in Josephine county, Oregon, the property of the said Company, for a period of six months from the date hereof, he to keep accounts of receipts and disbursements in connection with such operations, as hitherto, and the income, if any, to be applied in reduction of his claim; and it is hereby further agreed that, in case the said indebtedness has not been paid in full within the said period of six months, then and in such case all interest that the said Company may have in the Chinese Derrick Ground and the appurtenances thereto (save and except ' the said dredge) shall absolutely cease and be vested in the said William J. Harris freed from any claims on the part of the said Company; it being understood and agreed that the said Company may at any time pay off the said indebtedness, and thereupon all the terms and provisions in this paragraph mentioned shall cease, and the said Company shall also have the privilege during the said period of six months of having a confidential representative at the said dredge, who may reside thereat and shall be entitled to all information and inspection as to weighing of gold dust and checking same, and seeing that proper credit is given therefor, and generally shall be entitled to all information and details as to the operations of the said dredge. The said William J. Harris hereby agrees to diligently prosecute the obtaining of the United States patent to the said Chinese Derrick Claim, and upon the issue of such patent shall, so soon as his indebtedness has been paid off, grant and convey same to the English-Canadian Company. Time is the essence of this agreement.

"4. The parties of the fourth part agree that when and so soon as the above-mentioned share certificates have been delivered up by the said William Robert White, and the stock of the said Company thereby represented has been duly canceled, the said Company will execute a release to the said William Robert White, releasing him from all demands in connection with the promotion and organization of the said Company or otherwise howsoever.

"5. The said parties of the fourth part hereby further agree that when and so soon as the above-mentioned share certificates have been delivered up by the said Adam Hay Anderson, and the stock of the said Company thereby represented has been duly canceled, the said Company will execute a release to the said Adam Hay Anderson, releasing him from all demands of the said Company or otherwise howsoever.

"6. And the said William Pearson, on behalf of himself and the said William Morshead, hereby agree that they will, upon the performance of the agreements to be performed by the other parties hereto, use every effort to furnish or obtain the working capital that may be then necessary for the

proper carrying out of the undertakings of the said Company, and that the said William Morshead and William Pearson will not for a period of six months from the date hereof institute any proceedings whatsoever for realizing against the assets of the said Company any sums that may be due to them upon debentures issued to them, or either of them, by the said Company.

"7. And the said William Pearson hereby personally agrees that he will have John Carling Kelly return to the said Company for cancellation seven thousand five hundred shares on the terms hereinbefore provided in regard to other shares, and, in case the said John Carling Kelly refuses to make such return within three months from the date, then the    [T. A. B.] said William Pearson shall return such shares personally.

"In witness whereof the said parties hereto have hereunto set their hands and seals the day and year first above written.

"Will R. White,<br>
"By His Attorney,<br>
"George W. H. White.    [Seal.]<br>
"A. Hay Anderson.    [Seal.]<br>
"William J. Harris.    [Seal.]<br>
"The English-Canadian Co., Ltd.,<br>
"By Their Attorney,<br>
"William Pearson.    [Seal.]

"Signed, sealed, and delivered in presence of
"T. A. Beament."

On the same day the foregoing agreement was executed, Pearson, as representative of the Company, gave Harris the following instructions in writing: "Under my power of attorney I hereby authorize you to continue operating the dredge on the Chinaman's ground for sixty days for the account of the English-Canadian Company. You will keep accounts to be charged or credited to the company as hitherto."

Harris extended the time for the payment of his claim for six months, as agreed, fitted up the dredge with new parts, and commenced working the Waldo ground pursuant to the instructions above quoted; Pearson having a confidential agent there as a representative of the Company. Harris made monthly reports of his expenditures and receipts, by Pearson's directions, to the Company's auditor, Black, which showed that the expenditures exceeded the receipts. Harris also made application for patents to the placer ground, and various contests arose as to that matter, necessarily involving heavy expense. In other respects the Ottawa agreement was not carried out.

Morshead having become chairman of the board of directors of the company, the minutes of the board show these proceedings under date August 15 and 17, 1900, respectively:

"At a meeting held at the offices of Mr. Redshaw Williams, Solicitor, 14 Sherbourne Lane, London, E. C., August 15, 1900. Present: Walter Morshead, Chairman; William Pearson. In attendance: Mr. Redshaw Williams, Mr. T. A. Beament, Mr. John Maclachlan (of Messrs. Goodchild & Hammond), and Mr. A. E. Baines. On the motion of Mr. Morshead, it was resolved that Mr. A. E. Baines should act as secretary pro tem. On the motion of Mr. Morshead, it was resolved that the power of attorney granted by the company to Mr. W. J. Harris be and is hereby revoked. It was also resolved, on the motion of Mr. Morshead, that Mr. L. H. Wilkins, of Finsbury House, Blomfield Street, London, E. C., be and is hereby elected a director of the company.              [Signed]    W. Morshead, Chairman.

"At a meeting of the board held at the registered offices of the company at 11 a. m., on the 17th August, 1900. Present: Walter Morshead, Chairman; William Pearson, L. H. Wilkins. In attendance: Mr. Baines and Mr. Vince (of Messrs. Burchell Co.). On Mr. Morshead bringing forward the minutes of the meeting held on the 15th inst. for confirmation, Mr. Pearson objected, on the ground that the resolutions then passed had not been seconded, and were consequently illegal. For the same reason he objected to the presence of Mr. Wilkins and Mr. Baines. Mr. Morshead overruled these objections and declared the minutes confirmed. Mr. Pearson thereupon verbally tendered his resignation and retired. It was resolved that cables conveying the resolution revoking the power of attorney to Mr. Harris be sent forthwith to

Mr. Harris and other persons concerned. It was also resolved that Mr. A. C. Gale, Solicitor, of Rossland, B. C., be and is hereby appointed the company's representative in B. C., in the place of Mr. W. J. Harris. The meeting then adjourned until 3 p. m. at Finsbury House, Blomfield Street, E. C.

"[Signed] W. Morshead.

"At an adjourned meeting held at 3 p. m. at Finsbury House, Blomfield Street, E. C., on the above date (17th August, 1900). On the motion of Mr. L. H. Wilkins it was resolved that the resignation of Mr. William Pearson as director of the company be and is hereby accepted. * * * On the motion of Mr. Morshead, seconded by Mr. Wilkins, it was resolved that the registered offices of the company be and hereby are removed from 5, The Sanctuary, Westminster, S. W., to Finsbury House, Blomfield Street, E. C., and the acting secretary was instructed to file the necessary notice at Somerset House: The acting secretary was instructed to forward a copy of the minute revoking the power of attorney to Mr. W. J. Harris to the gentleman.

"[Signed] W. Morshead."

Thereafter Morshead and Wilkins claimed to be the board of directors, and held various meetings, and on September 20, 1900, adopted a resolution authorizing and requesting Morshead to proceed to this country and investigate and satisfactorily arrange the affairs of the company; a power of attorney having been subsequently given him for that purpose. The record shows that those affairs went from bad to worse. Pearson and Harris again met in Ottawa, at which time the latter's claims against the company, as audited by Black, amounted to about $41,000, and at which time they, in connection with one Major, entered into what is called the "Supplemental Ottawa Agreement," and which is as follows:

"Memorandum of understanding or agreement, arrived at between William Pearson, of the city of Paris, France, Esquire, and William J. Harris, of the city of Spokane, in the state of Washington, mine owner.

"Provided that the English-Canadian Company should fail to carry out the terms of its agreement with W. J. Harris and others, and should fail to make a payment to the said W. J. Harris required to be made on or before July 11, 1900, then and in such case the said W. J. Harris hereby agrees to prosecute and obtain the patent to the Chinese Derrick Ground and other ground adjoining same, and amounting in all to two hundred and forty acres, more or less, and upon obtaining such patent will forthwith convey the said property, with the appurtenances, to a company to be formed by the said William Pearson as hereinafter mentioned. The said W. J. Harris further agrees to assign to the said company six hundred and forty acres, more or less, of placer mining property located by the said W. J. Harris and others in the state of Idaho, United States of America, provided that a title thereto can be obtained; the said W. J. Harris agreeing to use every effort and endeavor to perfect and obtain a title to the said property. The said W. J. Harris shall also endeavor to purchase the dredge 'Josephine' now upon the said Chinese Derrick Ground in Josephine county, state of Oregon, at the lowest possible price, and upon the purchase thereof the said dredge shall become the property of the proposed company upon payment of the purchase price.

"The said William Pearson on his part agrees to organize a joint-stock limited liability company under the laws of the province of Ontario, having a nominal capital of one hundred and fifty thousand dollars ($150,000.00) in one dollar shares, the stock of which company to be allotted fully paid up in the following proportions:

W. E. Pearson.........................................63,000 shares
W. J. Harris..........................................29,000 shares
George R. Major....................................... 5,000 shares
T. A. Beament......................................... 2,000 shares
George M. Williams.................................... 1,000 shares

"The said William Pearson agrees to pay the said W. J. Harris thirty thousand dollars ($30,000.00) in manner following: On July 14, 1900, ten thousand dollars ($10,000), and on August 1, 1900, ten thousand dollars ($10,000), and the balance thereof on September 1, 1900.

200 F.—2

"In addition to the said payments to be made to Mr. Harris personally, the said William Pearson agrees to provide and pay to the said company for working capital, including sums to be advanced prior to the organization thereof, an amount in all of twenty thousand dollars ($20,000), such amount to be provided from time to time as required for the purposes of the said business.

"Dated at Ottawa this thirteenth day of June, 1900.

"William Pearson.
"W. J. Harris.
"G. R. Major."

Morshead came to Canada and to the United States, and in both countries instituted suits in regard to the matters in question, some against Harris and some against the Company, and Harris also commenced suit against the Company to recover what he claimed to be due him from it. In that condition of affairs an agreement was entered into between Morshead, Harris, and one De Lashmutt, at Spokane, Wash., by which the latter was to finance a new company to take over the property upon certain terms, and by which Harris' claim, therein stated to amount to $47,925.35, was to be paid in installments, within 90 days from the date of the agreement, and under which Harris received a bill of sale of the dredge "Josephine." The provisions of the Spokane agreement were not complied with, and Morshead commenced further proceedings against Harris. Finally, in July, 1901, Harris and Morshead, for himself and as attorney in fact for the Company, claiming to act under and by virtue of the power of attorney theretofore given him, entered into what is called in the record the "Grant's Pass Agreement," which is as follows:

### "Grant's Pass Agreement.

"This agreement, made and entered into this 9th day of July, 1901, by and between the English-Canadian Company, Limited, a corporation organized and existing under and by virtue of the laws of England, by Walter Morshead, its attorney in fact, party of the first part, Walter Morshead, of London, England, party of the second part, and Wm. J. Harris, of the city of Spokane, state of Washington, party of the third part:

"Whereas, heretofore, during the years of 1898, 1899, 1900, and 1901, differences have arisen between the parties of the first and second part and the party of the third part; and

"Whereas, owing to said differences and claims, suits, actions, and proceedings have been instituted and are now pending between the parties hereto at Rossland, in the province of British Columbia, Dominion of Canada, at Spokane, in the state of Washington, and at Grant's Pass, in the state of Oregon, all in courts of record in said respective places; and

"Whereas, the parties hereto are desirous of settling their said differences and releasing each other from any and all liability, except such as is hereinafter contained and set forth:

"Now, therefore, these presents witnesseth: That the aforesaid parties, in consideration of the premises, and for other good and valuable consideration them thereunto moving, and for the mutual promises and concessions herein contained, and for one dollar, cash in hand paid in lawful money of the United States of America, by the party of the first part to the party of the second part and the party of the third part, the receipt of which is hereby acknowledged, have and do hereby agree and bind themselves as follows, to wit:

"The claims of the said party of the third part for the moneys advanced to the party of the first part are adjusted, stated, and agreed upon at the sum of forty thousand dollars, which is to be evidenced, secured, and paid as follows, to wit: The party of the first part shall issue to the said party of the third part its four negotiable promissory notes of even date herewith, each for ten thousand dollars, bearing ten per cent. interest per annum from date until paid, the same to be due and payable on or before six, nine, twelve, and fifteen months from date, respectively, the said notes to be secured by mortgages executed and delivered by the party of the first part to the party of the third part, which shall be a first lien upon all the properties of the

party of the first part in British Columbia and in the state of Oregon, including the dredge 'Josephine,' and any improvements thereon or additions thereto, and all subsequently acquired property. If the aforesaid note to become due in nine months from date shall not be paid at maturity, then the whole of said sum of forty thousand dollars remaining unpaid shall be due, and the aforesaid mortgages may be foreclosed.

"II. The said party of the second part is to waive any lien which he may have, claim, or assert for any reason, cause, or account against the property of the party of the first part in British Columbia or in the state of Oregon, in favor of the aforesaid mortgages. making said mortgages a first lien upon all the properties of the party of the first part; and the said party of the second part shall make, execute, and deliver to the party of the third part all necessary stipulations, writings, and assurances to carry into effect the foregoing provisions and agreements, either in British Columbia or elsewhere.

"III. All actions now pending between the parties shall be dismissed, each party paying his or its own costs.

"IV. The party of the third part is to have a right to keep a person at the said dredge during the operation thereof, who is to have full opportunity to see and know the amount of gold taken out by the parties of the first and second part, which person shall be in the employ of the party of the first part, and is to be paid by the party of the first part the sum of fifty dollars per month, and is subject to be discharged by the party of the first part for cause.

"V. All indebtedness against the Company by reason of its operations in the state of Oregon, and for which the party of the third part is liable, is to be paid by the party of the first part, said sum not to exceed one hundred and seventy-five dollars, and, if not so paid, it may be paid by the said party of the third part, and shall become an additional charge and lien against the property of the Company under the mortgages aforesaid.

"VI. The first party shall convey unto the third party by good and sufficient deed all its right, title, and interest in and to the Lilly May Mine, situated at Rossland, British Columbia; provided, however, that it is here agreed that said property so conveyed is and shall be subject to any equities therein heretofore existing.

"VII. The party of the first part is to pay all costs of obtaining patents on the placer grounds in Josephine county, Oregon, including the balance due Willis and Rice; the latter being two hundred dollars, with interest thereon.

"VIII. The parties of the first part are to put a stacker on the dredge 'Josephine,' which dredge and stacker, with any other improvements thereon, are to be included in one of the mortgages herein provided for. The parties of the first and second part, in operating the said dredge, and in working the placer grounds in Waldo unorganized mining district in Josephine county, Oregon, known as 'No. 4 Placer Mine,' or formerly as the 'Chinese Derrick Ground,' shall do the same in a minerlike and workmanlike manner.

"IX. All claims heretofore existing or asserted by either of parties hereto against each other or against any other party hereto, of whatsoever nature, kind, or description, shall be and the same are settled, discharged, and released in full, save only as provided herein.

"X. The power of attorney from the English-Canadian Company, Limited, to Walter Morshead, shall immediately or as soon as may be put to record by the said party of the second part, both in Josephine county, Oregon, and at Rossland and Victoria, in British Columbia, at the expense of the party of the second part.

"XI. The party of the third part shall procure the dismissal of the adverse claims of Geo. W. Williams and T. Loyd Henry now pending in the United States land office at Roseburg, Oregon, and the two suits now pending [in] the district court in Josephine county, Oregon, entitled Geo. M. Williams v. Wm. J. Harris, and Geo. M. Williams and T. Loyd Henry v. Wm. J. Harris, and that he shall proceed with expedition to procure the patents from the United States to the placer grounds now standing in his name upon the records of Josephine county, Oregon, the same containing about two hundred and eighty acres of land, which, upon the procurement of the aforesaid patents, he is to convey to the party of the first part, without further considera-

tion save the nominal one, and it is understood as a condition of this agreement that the said party of the third part shall obtain a patent to the said land above referred to, and shall immediately or upon demand therefor convey the same to the party of the first part aforesaid.

"In witness whereof, the said parties hereunto have this day signed their names and affixed their seals.                    English-Canadian Company, Limited,

"By Walter Morshead,    [Seal.]
"Attorney in Fact.

"Witnesses:                          Walter Morshead.          [Seal.]
"A. C. Hough.                        Wm. J. Harris.            [Seal.]
"James J. C. Moore."

Pursuant to the last-mentioned agreement Morshead, as attorney in fact of the Company, executed to Harris the four promissory notes, aggregating $40,000, together with the mortgage stipulated for, and Harris executed a deed of the placer property to the English-Canadian Company, Limited, and placed it in the hands of the Company's attorney, to be delivered upon the issuance of the government patent therefor. Harris proceeded to settle with the adverse claimants to the placer ground, and received the government patent, whereupon the deed theretofore executed by him was placed upon record. In the meantime the English-Canadian Company, Limited, was wound up in proceedings commenced in one of the English courts, under which Pearson acquired all of its rights. No payment ever having been made upon any of the notes of the Company executed to Harris, the latter brought the present suit in one of the courts of Oregon to foreclose the mortgage, which suit was subsequently removed to the court below. The company answered the bill so filed, and, among other things, it denied that Morshead was its attorney in fact and the validity of the notes and mortgage. It also set up the compulsory winding up of the Company in the English court and the sale of all of its property to Pearson. Pearson was permitted to intervene in the suit, and filed a supplemental bill, which was subsequently amended, and Harris subsequently filed a supplemental bill, making Pearson a party thereto, in which supplemental bill Harris prayed, among other things, that, if it should be found that the mortgage was invalid because of want of authority in Morshead to execute it, a lien be impressed by the court in favor of Harris on all of the placer property for the full amount due Harris on the date of the Grant's Pass agreement. In his answer to the supplemental bill Pearson denied that any sum was due Harris at that date, and alleged the issue of the debenture bonds and title thereto in Pearson, and that Harris knew of the existence of the bonds at the time he advanced the money to the Company, if any advances he made, and that any claim that Harris might have is necessarily subsequent and subordinate to the claim of Pearson as owner of the debentures; that the debentures are equitable mortgages and constitute a prior lien as against one having actual notice. The affirmative averments of the answer to the supplemental bill were put in issue.

The court below held that the power of attorney executed to Morshead was invalid, and, as a consequence, that he was unauthorized to execute the mortgage sued on, but by its decree re-established the lien which it held Harris had upon the property in question at the time of the execution of his deed therefor pursuant to the Grant's Pass agreement.

Dolph, Mallory, Simon & Gearin, Chester V. Dolph, and Hall S. Lusk, all of Portland, Or., for appellant.

H. D. Norton, of Grant's Pass, Or., for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] From the decision of the trial court that the mortgage executed by Morshead in the name and on behalf of the English-Canadian Company, Limited, was invalid, Harris took no appeal, and therefore the decision in that regard must be taken as correct. It was based upon the

conclusion that the meeting of the directors of the Company, at which the power of attorney was authorized to be executed to Morshead, under which the mortgage here in question was given, was not a legal meeting, and as a consequence that both the power and the mortgage were void. The same view of those proceedings was taken by Mr. Justice Martin of the Supreme Court of British Columbia, in the case of Harris v. Morshead, which was one of the numerous suits referred to in the statement of the case. Relying, however, upon the validity of both of those instruments, and in consideration of the execution of the mortgage given to secure the payment of money due him, Harris conveyed to the Company the title to the property in question, upon which he held an equitable lien as security for advances made by him to the Company. We regard it as clear, as did the court below, that equity in such circumstances will re-establish the lien, even as against Pearson as holder of the debentures—assuming their validity in his hands. The record shows that Harris made the advances to the general account of the Company, on the credit of the property as well as of the Company, and that they were expended in the development of the properties under his control as general agent of the Company, and without reference to any specific piece of property. For such advances he had an equitable lien upon the property. 1 Am. & Eng. Encyc. of Law, p. 1119, and cases there cited. Moreover, Pearson, as attorney in fact for the company—the validity of whose power of attorney is not questioned—in and by the Ottawa Agreement, for and on behalf of the Company, expressly agreed with Harris, among other things, as follows:

"And the said party of the third part [Harris] hereby agrees to extend the time for payment of his claim against the said Company, and any interest that may be due him at the rate of ten per centum per annum for a period of six months from the date hereof, and in consideration of such extension of time for payment, and in order to secure the said indebtedness, the said Company hereby grants unto the said William J. Harris the right to operate and use the dredge 'Josephine,' situate in Josephine county, Oregon, the property of the said Company, for a period of six months from the date hereof, he to keep accounts of receipts and disbursements in connection with such operations, as hitherto, and the income, if any, to be applied in reduction of his claim; and it is hereby further agreed that, in case the said indebtedness has not been paid in full within the said period of six months, then and in such case all interest that the said Company may have in the Chinese Derrick Ground and the appurtenances thereto (save and except the said dredge) shall absolutely cease and be vested in the said William J. Harris freed from any claims on the part of the said Company; it being understood and agreed that the said Company may at any time pay off the said indebtedness, and thereupon all the terms and provisions in this paragraph mentioned shall cease, and the said Company shall also have the privilege during the said period of six months of having a confidential representative at the said dredge, who may reside thereat and shall be entitled to all information and inspection as to weighing of gold dust and checking same, and seeing that proper credit is given therefor, and generally shall be entitled to all information and details as to the operations of the said dredge."

[2] When Harris' advances were made, and when his liens attached, the English-Canadian Company, Limited, was a going concern. Liens attaching to the property of a company under such circumstances, in the country where the property is situated, are not sub-

ject to any lien of valid English debentures, even according to the law of England, by which, as we understand it, the lien conferred by such instruments is a floating lien, which does not restrict or in any way interfere with the corporation issuing the debentures from prosecuting the business for which it was organized, in foreign countries, and there incumbering, transferring, or otherwise dealing with its property in the ordinary course of business. And such was the holding of the Supreme Court of Minnesota in the case of Howard v. Iron & Land Co., 62 Minn. 298, 302, 64 N. W. 896.

The issuing of debentures by English corporations is authorized by the Companies Act of 1862 (St. 25 & 26 Vict. c. 89), and by that of 1862 (2 Chitty's Statutes, p. 16, § 43) express provision is made for registration of charges or liens in order to fix them upon specific property. The debentures here in question, after providing for the payment of the principal and interest as stipulated in the bond, contain, among others, these clauses:

"3. The Company hereby charges with such payments all its property whatsoever and wheresoever, both present and future, including its uncalled capital for the time being.

"4. This debenture bond is issued subject to the conditions indorsed hereon, which are to be deemed part of it, pursuant to a resolution of the board passed on the fourteenth day of July, 1899."

And among the conditions indorsed thereon are the following:

"This debenture is one of a series of debentures of the Company for securing principal sums not exceeding in the aggregate the sum of £15,000. The debentures of the said series are to rank pari passu as a first charge on the undertaking of the Company, without any priority one over another, and such charge is to be a floating security, but so that the Company is not to be at liberty to create any mortgage or charge on any of its property in priority to said debentures.

"2. A register of the debentures will be kept at the Company's registered office, wherein there will be entered the names, addresses, and descriptions of the holders, and numbers of the debentures held by them, respectively, and such register will at all reasonable times during business hours be open to the inspection of the registered holder or his legal personal representatives.

"3. The registered holder will be regarded as exclusively entitled to the benefit of this debenture, and all persons may act accordingly, and the Company shall not be bound to enter in the register notice of any trust or to recognize any right in any other person save as herein provided."

That the lien of such debentures is but a floating charge, until fixed by some appropriate proceeding upon some specific property of the company issuing the bonds, seems to be the holding of the English courts. Thus, in the case of Ward v. Valletort, etc., Co., Limited, [1903] 2 Ch. Div. 654, where the debentures issued by the Company were similar to those here presented, and where, after the issuance of the bonds, the company deposited title deeds with a bank as security for advances, the court said:

"In the present case, although the managing director did not in language state to the bank that its debentures did not affect the hereditaments comprised in the title deeds, or prevent the company from making valid deposit, he in fact deposited the deeds with the bank to secure the overdraft, and by such act represented that he had power to do so. He certainly thought that he had that power, as he says that condition 4 was not present to his mind; and his action was precipitated by the title deeds being left by the debenture

holders in the custody of the company. Condition 2 probably shows why the deeds are left in the possession of the company—namely, in order that the company might be at liberty to sell or otherwise deal with all or any part of their property in the course of their business, and for the purpose of carrying on the same. Under these circumstances the observations of Romer, J., in Castell & Brown, Limited, 1 Ch. Div. (1898) 315, 321, are directly applicable. He says: 'I now look to see how it was that the company retained possession of the deeds, notwithstanding the debentures. The reason appears to me obvious: The debentures were only intended to give what is called a floating charge; that is to say, it was intended, notwithstanding the debentures, that the company should have power, as long as it was a going concern, to deal with its property as absolute owner, and I infer that it was on this ground that the company was allowed to and did retain possession of the deeds. In other words, the debenture holders, notwithstanding their charge, and, indeed, by its very terms, authorized their mortgagor, the Company, to deal with its property as if it had not been incumbered, and left with their mortgagor the deeds in order to enable the company to act as the owner. It is true that, having given this general authority to the Company, the debentures purported to put a certain special restriction on its exercise. By the first condition it was provided that, though the charge was to be a floating security, the Company was not to be at liberty to create any mortgage or charge upon its freehold and leasehold tenements in priority to the debentures. This restriction was no doubt quite valid as a private arrangement between the Company and the debenture holders; but can the debenture holders, under the circumstances, set it up against the bank taking the security without notice? I think not. I take it to be established that if a first mortgagee, even though he has the legal estate, authorizes the mortgagor to retain the deeds in order that the mortgagor may thereby, as ostensible owner of the property, be able to deal with it, though only to a limited extent, yet if the mortgagor takes advantage of the deeds so left with him to deal with the property to an extent beyond what was authorized, then the mortgagee cannot set up his charge against an incumbrancer for value without notice, who claims under the unauthorized dealing and relied on the deeds and the apparent ability of the owner to deal with the property free from incumbrance.' "

In the case at bar Harris acquired his equitable lien in the ordinary course of the business of the Company, and while it was a going concern, with notice of which Pearson is properly chargeable, and the initiation of which was long before Harris knew of the issuance by the English-Canadian Company, Limited, of any debentures; the first notice to him, so far as appears, being imparted by the Ottawa agreement of January 11, 1900.

In the case of Norton v. Florence Land & Public Works Co., 7 Ch. Div. 332, the company was organized under the Companies Act of 1862, and empowered to issue debentures and mortgage bonds. The language of the bonds, so far as it related to the company's property, was as follows:

"Do hereby, in pursuance and under the power of their articles of association, bind themselves, their successors, assigns, and all their estate, property, and effects to pay the said," etc.

The company's office was in London, and, having real estate in Florence, Italy, it raised money by issuing obligations payable to bearer, binding all its estate, property, and effects. Subsequently the Florence property was mortgaged to a bank, which took the mortgage with notice of the former obligations. The holders of the latter sought to restrain the bank from selling the company's property at Florence, claiming that they were prior mortgagees under the deben-

tures. Jessel, Master of the Rolls, rendered the opinion of the court denying the motion, and, after stating two grounds for the ruling, proceeded to say:

"But there is a third, and in my opinion a fatal, answer, which is that, if the law of England does apply, still, as I read this document, the plaintiff has no charge on the houses in Florence; that is, supposing it were property in London, instead of in Florence, I should hold that the plaintiff had no charge on it whatever. That depends on the construction of the instrument which I have before me. It seems that the Florence Land & Works Company are authorized to issue bonds and mortgages. The question is whether the document which they did issue was a bond or a mortgage. In my opinion it is a bond. First of all, and that is a very strong point as between the parties, they themselves call it a bond. Now, there are two terms by which English lawyers designate bonds, both well-known terms; one is 'bond,' and the other is 'obligation.' Oddly enough, we generally use the term 'bond' to distinguish the instrument, and the terms derived from 'obligation' or from 'oblige,' to distinguish the parties to it. We speak of a bond, and of the obligor and the obligee of a bond. But still the word 'obligation' denotes a bond, as well as the word 'bond.' Now, this instrument is headed by the word 'obligation,' in very large letters. But this is not all. 'In consideration of the sum of £1000 the company bind,' which is a term of a bond, 'themselves, their successors, assigns, and all their estate, property, and effects,' to pay to John Norton £100, with the interest. The words 'estate, property, and effects' themselves are common words of a bond. They bind themselves to pay, and then follows the common condition on a bond: 'Provided always, and it is hereby declared that this bond is issued subject to and in accordance with the condition of a scale indorsed hereon.' So that we have it called 'a bond,' and it is subject to a condition, and when we look at the condition we find the common condition to pay: 'The company reserves the right of redeeming this, and any other obligations as they think fit,' by drawings. And then they redeem them in the way they mention. The bond becomes payable with accruing interest on the 30th of June following the time when it is drawn. That is very important, because, although in the body of the bond the sum is made payable to the bearer, the condition does not make it payable to bearer on presentation, but delays the payment until the time mentioned after each drawing. That being so, there is nothing to show that it is otherwise than a bond. The words relied on are these: It is said they not only 'bind themselves, their successors, and assigns,' but 'all their estate, property, and effects.' Of course they do; a bond always does in a sense bind the property. In the case of a corporation, it can bind nothing else; it never could bind the persons who were corporators, and now, in the case of an individual, it does not even bind him in his person, but in his property generally, just as property was always bound to pay debts on judgment, and in no other way. Any different interpretation will lead to the most wonderful results. First of all, if it is a mortgage, it should take effect in order of date, and if some thousands were issued on several days, is each one to take precedence of the others according to date? It was argued, 'No, they take pari passu, because they were issued as part of the capital of half a million, and the words "Capital half a million" are upon it.' That will not do; that does not show it. If there are no words in the instrument to make them pay otherwise than according to date, according to our law they take according to date. If they take according to date, what is the meaning of tossing them into a box and drawing them so many at a time, paying those drawn, and leaving the others unpaid? How could you pay those, and leave the others unpaid, if the others have a prior charge on the property, and you cannot make the property available for payment? It seems to me that the words of the thing, and the reason of the thing, all point the same way: It is a bond, and nothing more; and I so hold."

In the case of Moore v. Anglo-Italian Bank, 10 Ch. Div. 687, the same learned judge, referring to the Florence Land Company Case, says:

"That established something more than that the plaintiffs had a charge; it also established that the charge was subject to any mortgage made by the company carrying on their business before the debenture holders interfered to stop them, and therefore, in equity, notice or no notice of the charge of the defendants, the Italian bank would be prior to that of the plaintiff."

See, also, In re Hamilton's Windsor Iron Works, 12 Ch. Div. 707, 713, 714; Colonial Trusts Corp. Case, 15 Ch. Div. 468, 469, 472; Panama Mail Company Case, 5 Ch. App. Cas. 318; Yorkshire, etc., Association, [1903] 2 Ch. Div. 284; Foster v. Borax Co., [1899] 2 Ch. Div. 135; In re Maudslay Sons & Field, [1900] 1 Ch. Div. 602; Roper v. Costell and Brown, [1898] 1 Ch. Div. 315.

In Palmer's Company Precedents, it is said:

"There was at one time a notion that a general charge upon all the property of a company, present and future, was ultra vires; but that notion has long since been exploded, and it is now well settled that such a charge is valid and effective. Such a charge creates a valid equitable security by way of floating charge upon the assets for the time being of the company, and only attaches finally on the appointment of a receiver, or on a winding-up, or when the company ceases to be a going concern. In the meantime it leaves the company at liberty to deal with its assets in the ordinary course of its business, by way of sale, lease, exchange, specific mortgage, or otherwise, as may seem expedient. The terms of the floating charge may limit the company's power of dealing with its property; e. g., *may prohibit the creation of prior charges*. The company's power to deal with the assets, unless otherwise expressed in the debenture, is limited to dealing in the ordinary course of the business of the company. Accordingly it was held that a sale of the whole undertaking of the company with a view to its coming to an end was not a dealing with the assets in the ordinary course of business, and could not be justified as against the holder of a floating security. A general charge is not the less effective because it is expressed in general terms and covers future property as well as present. * * * Although a floating charge does not finally attach until a final winding-up or an appointment of a receiver, this only means that until then the company can deal with the property in the ordinary course of its business; but it does not mean that there is no charge until then. A debenture usually purports to be a present charge; e. g., 'the company hereby charges its undertaking and all its property, present and future.' And though it is necessary, in order not to paralyze the business, to construe such a charge as giving the company an implied power or license to deal with the property in the ordinary course of its business, there is no necessity or reason for holding that the charge is not to take effect at once, subject to that power. Re Florence Land Co., 10 Ch. Div. 530; Id. 632. However, land situated abroad, but belonging to a company registered here, can in most cases be effectually charged in favor of debenture holders or their trustees, without regard to the formalities required by the local law in relation to transfers or mortgages. For it was settled long since that the Court of Chancery, by virtue of its jurisdiction in personam, would, as between persons resident here, enforce equities in regard to foreign land. * * * The jurisdiction of the Court of Chancery being now vested in the High Court, it seems clear that if a company registered here covenants or purports to convey foreign land to trustees for debenture holders, or purports to charge it by the debentures or otherwise, or covenants that it shall stand charged in favor of debenture holders, the court will, if occasion arises, enforce the equity just as if the land were in England, and consequently, unless the local law forbids, will compel the company to convey the land, so as to give effect to the relief decreed. See Holroyd v. Marshall, 10 H. L. C. 191. And in accordance with the principles above referred to, relief has in many cases been granted here to the holders of debentures on foreign land." Palmer, pp. 631, 632, 635.

The record shows that Pearson had knowledge of the condition of the title to the placer ground and of Harris' claims, and that he pur-

chased the Company's property at the liquidators' sale in England "subject to the liens thereon." He cannot, therefore, be held to have acquired a paramount lien to that of Harris, even if it be conceded that the debentures ever became a lien upon the Company's property in Oregon. Besides, we are not prepared to hold that the debentures in question were valid instruments as against Harris. The record in the case shows that long prior to July 14, 1899, the Company had run out of funds and had become indebted to Harris for advances made by him to its account in order that its mining operations be continued. The correspondence between the parties and the statements rendered by Harris to the Company show this. Notwithstanding that indebtedness, and the inability of the Company to pay it, and without authorization by the shareholders so far as appears, the minutes of the Company show that on the 14th day of July, 1899, at a meeting of the directors held at the Company's office, and at which were present Anderson, as chairman, and Messrs. Morshead, Mortimore, and Pearson—

"Mr. Morshead explained to the board that since the last meeting charges on the Company's assets have been arranged by the directors as follows: £5,560 advanced by himself, £750 by Mr. Anderson, and £750 by Mr. Pearson. He also reported that further sums amounting to £2,940 would probably be required to meet expenses, and it was resolved that the money already advanced be secured on an equitable charge, the trustees to be Mr. Anderson and Mr. Morshead, and that a further sum of £5,000, making, with the amounts aforesaid, the sum of £15,000, be borrowed and secured on the assets of the Company in like manner, and that deeds be drawn up, sealed by the Company, and handed to Mr. Morshead, Mr. Anderson, and Mr. Pearson."

The foregoing is the first suggestion appearing in the record concerning the issuance of any debentures or the creating of any lien upon the property of the company, and all of the persons thus proposed to be secured were directors of the Company. According to the minutes of the Company, no debentures had then been issued; for at a meeting of the board held on the 14th day of November, 1899, at which were present Morshead, chairman, and Pearson and Mortimore—

"Mr. Morshead informed the board that he had bought debenture bonds to secure the £3,500 and £2,000 advanced by him, and also for the £750 advanced by Mr. Anderson and the £750 advanced by Mr. Pearson, and it was resolved, that debenture bonds be sealed securing those amounts to the creditors."

Yet ten days before this last meeting, authorizing the issuance of the debentures to secure the money advanced by the directors, to wit, on the 4th of November, 1899, the minutes of the Company of that date disclose these proceedings at a meeting at which were present Anderson, Morshead, and Pearson:

"The question as to the course the directors were to adopt in the present crisis was discussed. Mr. Burchell advised that Mr. Harris should be temporized with, and should be again asked to meet Mr. Morshead in Montreal; at the same time, if the creditors wished, application should be made to the court for the appointment of a receiver, and he, on behalf of the Company, would assent thereto, and he advised that Messrs. Anderson, Morshead, and Pearson should be appointed receivers to the Company. The meeting was then adjourned until 1:30 at the Colonial Club, when Mr. Mortimore was also present, and after some discussion the following resolutions were passed:

It was proposed by Mr. Pearson, seconded by Mr. Anderson, and resolved, that all documents of title and other securities belonging to the English-Canadian Company, Limited, now in the custody and possession of Messrs. Burchell & Co., solicitors to the Company, be held by them for and on behalf of the debenture holders by way of equitable mortgage, in the terms of the resolution of the board dated the 14th day of July, 1899. It was proposed by Mr. Anderson, seconded by Mr. Mortimore, and resolved, that under existing circumstances the board assents to an application intended to be made forthwith by Messrs. Anderson, Morshead, and Pearson, as equitable mortgagees, to apply to the court for the appointment of a receiver, being of opinion that this is the proper course to be adopted in the interests of the shareholders."

Two days later, to wit, November 6, 1899, at a meeting of the board at which were present Anderson, Morshead, and Mortimore, as directors, and Mr. Burchell (the company's solicitor) and the secretary in attendance, "Mr. Morshead reported that a receiver could not be appointed immediately as there were no assets in England," and at which meeting "a discussion took place as to the expediency of a director proceeding to Canada, and Mr. Burchell having strongly expressed his views on the subject, it was resolved, that Mr. Pearson should be cabled to in Paris to ascertain if he would start for Canada on Wednesday." At the subsequent meeting of the board of November 10, 1899, "held at the Colonial Club, No. 4 Whitehall Court," at which were present only "Mr. Morshead, in the chair. Mr. Pearson. In attendance the secretary"—the following, among other, proceedings were had:

"The committee were of opinion that Mr. Pearson should start for Canada as soon as possible, and the secretary was instructed to let him have a list of the documents of title in the Company's possession and a list of the documents of title which are missing. It was also resolved that the deeds themselves should be handed to Messrs. Hoare's Bank as security for the money which had been advanced. A discussion as to the title deeds belonging to the Company in the possession of Messrs. Burchell & Co. took place, and it was resolved, that they be handed to Messrs. Hoare & Co., the bankers, as security for the creditors entitled to debentures under the terms of the resolution of the 14th July, 1899."

In view of these proceedings, and of the well-established rule that directors are not permitted to secure themselves at the expense of other creditors, we repeat that we are not prepared to hold the debentures in question valid as against Harris' claim, but refrain from deciding the question, as the views above expressed on other points render it unnecessary to do so.

The record, we think, would not justify us in interfering, on the appellant's behalf, with the judgment of the court below in respect to the amount found to be due the complainant.

The judgment is affirmed.